# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| **DOUGLAS QUINNEY,**<br><br>**Plaintiff,**<br><br>v.<br><br>**SWIRE COCA-COLA, USA,**<br><br>**Defendant.** | **MEMORANDUM DECISION AND ORDER**<br><br>**Case No. 2:07-cv-788-PMW**<br><br>**Magistrate Judge Paul M. Warner** |

Before the court is Swire Coca-Cola, USA's ("Swire") motion for summary judgment.[1] On March 5, 2009, the parties appeared before the court for oral argument on that motion.[2] David J. Holdsworth appeared on behalf of Douglas Quinney ("Quinney"), and Kevin W. Bates appeared on behalf of Swire.[3] The court has carefully considered the parties' written submissions on the motion, as well as the arguments presented by counsel at the above-referenced hearing. Now being fully advised, the court is prepared to rule on the motion.

## RELEVANT BACKGROUND

In its supporting memorandum, Swire has included a statement of undisputed material facts.[4] In his memorandum in opposition to Swire's motion, Quinney repeated each numbered

---

[1] *See* docket no. 19.

[2] *See* docket no. 27.

[3] *See id*.

[4] *See* docket no. 20 at vii-xxx.

paragraph of Swire's statement of facts, along with his response to each numbered paragraph.[5] With only a few exceptions, Quinney has indicated that he does not dispute Swire's statement of facts.[6]  Accordingly, the following recitation of the facts will borrow largely from the statement of facts contained in Swire's supporting memorandum; however, it will include only those facts that are undisputed.

Quinney began his employment with Swire as a part-time Merchandiser on June 25, 1984.  After several promotions and changes of position, Quinney was promoted to the position of Account Manager on May 29, 1989.  Quinney held the position of Account Manager for the remainder of his employment with Swire.

On April 24, 2000, Dr. Max Lundberg diagnosed Quinney with ankylosing spondylitis. Dr. Lundberg confirmed his diagnosis on May 3, 2000.  During Quinney's April 24, 2000 appointment with Dr. Lundberg, Dr. Lundberg prescribed to Quinney the narcotic Lorcet (also called Lortab), which contains the synthetic opiate narcotic hydrocodone.  Over approximately the next eighteen months, the amount of opiate narcotics Dr. Lundberg prescribed for Quinney rapidly increased.  Those medications included increased doses of Lorcet, as well as prescriptions for Oxycontin, Soma, and Duagesic patches.  During that same time period, Quinney also received additional prescriptions for opiate narcotics (e.g., Oxycontin) from physicians other than Dr. Lundberg.

---

[5] *See* docket no. 24 at ii-xxxv.

[6] *See id*.

2

On several occasions during that time period, Quinney's physicians noted that Quinney was either misusing or overusing his narcotic pain medication. Eventually, Dr. Lundberg's concern regarding Quinney's use of and potential addiction to narcotic pain medications led him to refer Quinney to a pain management specialist.

On December 3, 2001, after hearing from one of Quinney's coworkers that Quinney was abusing and/or overusing his narcotic pain medication, Swire requested that Quinney take a drug test. Swire made that request pursuant to its Policy on Drug and Alcohol Misuse. Quinney expressly gave his written consent to permit Swire to test him for drugs. As required by the above-referenced drug policy, Swire placed Quinney on a three-day paid leave of absence while Quinney's drug test results were being processed.

On December 5, 2001, Swire received the results of Quinney's drug test, which stated that Quinney tested positive for hydrocodone. On the same date that Swire received the results of Quinney's drug test, Swire also received a report from the Medical Review Officers at WorkCare. In the report, WorkCare physician Dr. Mark V. Anderson concluded that, according to his professional judgment, Quinney should not operate company a vehicle while taking narcotic pain medication.

The operation of a vehicle is an essential function of the position of Account Manager. Indeed, Quinney testified during his December 2005 deposition that it is not possible to perform the functions of an Account Manager without being able to drive.

Swire maintains a safety policy, which is contained in Swire's Safety Policy Handbook. On May 5, 1997, Quinney signed an Employee Acknowledgment of Receipt of Safety Policy

Handbook in which he acknowledged that he received a copy of the Safety Policy Handbook and committed to familiarize himself with it.  In relevant part, Swire's Safety Policy Handbook provides that "[Swire] requires any employee who drives a [Swire] motor vehicle as part of his/her job duties to meet the following requirements: . . . . Be able to drive a motor vehicle safely."[7]  Swire's Safety Policy Handbook further provides, in relevant part, that "[s]ome of the rules that [Swire] expects its employees who drive motor vehicles to obey include the following: . . . Never drive while under the influence of alcohol, illegal drugs or legal drugs which may impair the ability to drive."[8]

Based on Dr. Anderson's recommendation, Swire informed Quinney on December 6, 2001, that in order to resume working in his Account Manager position, he must cease using narcotic pain medication.  That same day, Swire placed Quinney on paid leave while Quinney decided whether he would quit taking the narcotic pain medication so that he could return to work at Swire as an Account Manager.

On December 31, 2001, while Quinney was receiving paid leave, Swire provided Quinney with a document outlining the "Steps for Returning to Duty."[9]  Those steps required Quinney to notify Swire once he had ceased his use of narcotics and to submit to a "Fitness for Duty" examination by the physicians at WorkCare.[10]

---

[7]  Docket no. 20, Exhibit A, Exhibit 9 thereto.

[8]  *Id.*

[9]  Docket no. 20, Exhibit A, Exhibit 12 thereto.

[10]  *Id.*

4

Rather than choosing to cease using narcotics, Quinney attempted to obtain from his physicians a note stating that he was capable of safely operating a vehicle while taking his prescribed narcotics.  No physician who was treating Quinney or prescribing narcotic pain medications to him ever provided to Swire any clearance of Quinney to operate a vehicle while taking his narcotic pain medications.  Indeed, Dr. Lundberg, who was Quinney's primary treating physician for approximately eighteen months prior to Quinney's December 3, 2001 drug test, flatly refused to provide Quinney with any such clearance.  In one of Dr. Lundberg's reports, he wrote:

> I also spoke with my nurse after you phoned today.  From what I understand, you had a drug screen that showed the presence of narcotics that are prescribed for pain control.  The nurse indicated that you wanted me to write a letter explaining that it is OK for you to drive with the medication that you are taking.  This is something that I can't do.  Narcotic medications cause drowsiness.  We've discussed this in the past.  I am aware that you don't feel that you are impaired, and that you have continued to drive using the medicines, but I don't approve of this and will not write a letter that says that it is OK to take narcotics and then drive.
>
> You will need to work the employment problem out with your employer.  If you continue to use narcotic pain medication, you may have to change your work.[11]

Similarly, Dr. Lordon, whose first visit with Quinney was on December 11, 2001 (over a week after Quinney's drug test), wrote the following in a December 20, 2001 letter in response to Quinney's request:

---

[11]  Docket no. 20, Exhibit H.

5

> Mr. Doug Quinney was evaluated by me for the first time on
> December 11, 2001.  Working diagnosis is chronic back pain
> secondary to ankylosing spondylitis.  Mr. Quinney's pain is
> mechanical in origin.  His pain has not been responsive to physical
> therapy and to aspirin-like drugs.  He is on appropriate amounts of
> Lorcet, Duragesic, and Soma.  Medical literature states that
> tolerance to sedative effects from opioids occurs rather quickly,
> while retaining pain-relieving effects.  Mr. Quinney states he is not
> sedated on these medications.  Lorcet has a slightly higher chance
> of creating some sedation because of its high peak levels compared
> to Duragesic.  I have advised him to discontinue the Lorcet.
> Studies out of Finland show that the accident rate is no different on
> people with or without taking opioids.  I have many commercial
> vehicle drivers[,] including interstate truck drivers[,] on the same
> medication.  I always inform the employer if there are any
> significant changes, and I caution[] the patient[s] when I make any
> significant changes in their medications.  I have advised Mr.
> Quinney that an objective independent driving test could be done
> through the rehabilitation department here at the University of Utah
> Hospital to determine his reaction times, and to determine if there
> are any particular concerns.  If this test came up normal, I would
> have no concerns with him continuing to drive for [Swire].  If there
> are any other questions or concerns, please feel free to contact
> me.[12]

When questioned about that letter during his deposition, Dr. Lordon testified that he did not always require his patients to take the driving test before clearing them to operate a vehicle, but that in Quinney's case he did require the driving test and would not have written a clearance note for Quinney without him having taken the driving test.  While some of the parties' communications with respect to the driving test are disputed, it is undisputed that Quinney never took the test.

---

[12]  Docket no. 20, Exhibit I.

Regarding hydrocodone, Dr. Lordon testified during his deposition that he counsels his patients who are drivers not to take Lorcet before or while they are driving because it is short-acting and may have an added sedative effect while driving.  Dr. Anderson, testified in his affidavit that synthetic opiates such as hydrocodone carry a potential of causing drowsiness and impairment of judgment in an individual taking them and that individuals who consistently take such medications should not operate a vehicle.

At the time of Quinney's drug test, Quinney was also using a 100 microgram Duragesic patch (containing the strong narcotic fentanyl).  Because fentanyl is so powerful and used primarily for general anesthesia, pre-anesthesia, or for patients suffering from terminal cancer, it is not screened in a nine-panel drug test such as the one administered to Quinney.  Therefore, Quinney's use of fentanyl did not register on his drug test.

After Quinney's dosage of fentanyl had been reduced on January 8, 2002, from one 100 microgram Duragesic patch to one 75 microgram patch every three days, Dr. Lundberg stated the following regarding Quinney on February 19, 2002:  "He seems to be sedated on a fairly regular basis with the use of the fentanyl patch."[13]  Dr. Anderson stated in his affidavit that Quinney's use of fentanyl provides further support to his recommendation to Swire that it not permit Quinney to operate a company vehicle while taking narcotic pain medication.

On January 8, 2002, Quinney submitted to Swire a request for leave under the Family and Medical Leave Act.  Also in January 2002, Quinney applied for short-term disability from Swire.

---

[13] Docket no. 20, Exhibit M.

Swire approved Quinney's request and granted Quinney paid short-term disability leave from January 11, 2002 until April 11, 2002.  In April 2002, Swire extended Quinney's paid short-term disability leave until June 11, 2002, the maximum time allowed under Swire's policy regarding short-term disability leave.

On June 4, 2002, Quinney filed his charge of discrimination against Swire.  Quinney alleged in his charge, in part, that after Swire required him to take a drug test:

> I was told I failed the drug test, even though every drug that
> showed on the test was prescribed by my doctor.  I was able to do
> my job without any problems, but I was put on short[-]term
> disability against my will.  This employer refuses to allow me back
> to work unless I cease taking all narcotics, including prescriptions.
> My prescriptions are necessary treatment for my disability.[14]

On June 10, 2002, Quinney submitted an application for long-term disability.  Also in June 2002, Quinney applied for Social Security disability benefits.  Quinney stated in his Social Security disability application that he would not like to receive rehabilitation services that could help him get back to work.  Quinney also wrote the following remarks in the application:

> I am in severe chronic pain.  It is impossible to sit for any period of
> time.  Standing for any length is also hard.  My pain is less when I
> am sleeping.  I can't think of a job where I would have the
> flexibility to start when I needed, walk around or stretch and sleep
> again because of the pain [and] muscle medication.[15]

On July 9, 2002, Quinney and Swire met for a resolution conference at the offices of the Utah Antidiscrimination and Labor Division in an effort to resolve the issues between the parties.

---

[14]  Docket no. 20, Exhibit R.

[15]  Docket no. 20, Exhibit N.

At the conference, Quinney requested that Swire allow him to return to his former position of Account Manager but continue using his narcotic pain medications.  Swire denied Quinney's request and again informed Quinney that Swire could not permit Quinney to return to a driving position until he ceased using narcotic pain medications.  However, Swire offered to work with Quinney in identifying and possibly transferring him to an open position within Swire for which Quinney was qualified.  Swire made no guarantee, however, that any positions would be available within Swire, that Quinney would qualify to perform any open position, or that the pay of any available positions would be the same as the pay Quinney received in his Account Manager position.

Beginning in early July 2002, Swire arranged weekly meetings with Quinney to assist him in his job search within Swire.  Swire collected a list of all open positions from each of Swire's sales centers in Utah and surrounding states and presented the list to Quinney during each of his weekly meetings with Swire.  Quinney met with Swire on four separate occasions over the course of a month and a half to discuss openings within Swire (July 10, 2002, through August 23, 2002).  Swire offered Quinney every open position within Swire for which Quinney was qualified and that did not require operating a vehicle as an essential function of that position.  Quinney did not accept any of the open positions offered to him by Swire during this time period.

On August 9, 2002, Quinney's request for long-term disability was approved.  Because of that approval, on August 22, 2002, Quinney terminated his employment with Swire.

In August 2005, Swire served Quinney with its First Set of Interrogatories and Requests for Production of Documents.  One of those interrogatories asked Quinney to "[i]dentify each

9

and every request for reasonable accommodation you communicated to Swire, to whom at Swire such request was made, the date such request was made and describe how you conveyed such request."[16]  Quinney responded to that interrogatory as follows:  "I have never requested any accommodations[.]"[17]  Another one of Swire's interrogatories asked Quinney to "[d]escribe what specific accommodations you requested from Swire that would enable you to perform the functions of the position you held or desired."[18]  Quinney responded by stating:  "It was not necessary for me to request accommodations.  None were requested[.]"[19]

During his December 2005 deposition, Quinney testified that he was unable to identify a specific, vacant position at Swire that he desired and for which he was qualified.  Instead, Quinney testified that Swire could have simply created a position for him.

## STANDARD OF REVIEW

"Summary judgment is appropriate when 'there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.'"  *Chastain v. AT&T*, 558 F.3d 1177, 1181 (10th Cir. 2009) (quoting Fed. R. Civ. P. 56(c)) (alteration in original).  When considering a motion for summary judgment, the court views "all facts in the light most favorable to the party opposing summary judgment."  *Id*. at 1180 (quotations and citation omitted).

---

[16]  Docket no. 20, Exhibit P.

[17]  *Id*.

[18]  *Id*.

[19]  *Id*.

>Under Rule 56(c), the moving party has the initial
responsibility to show that "there is an absence of evidence to
support the nonmoving party's case."  If the moving party meets
this requirement, the burden shifts to the nonmoving party to make
a showing sufficient to establish that there is a genuine issue of
material fact regarding "the existence of an element essential to
that party's case, and on which that party will bear the burden of
proof at trial."  The nonmoving party may not rest upon the mere
allegations or denials of [his] pleading . . . .  The nonmoving party
must go beyond the pleadings and establish, through admissible
evidence, that there is a genuine issue of material fact that must be
resolved by the trier of fact.  The mere existence of a scintilla of
evidence in support of the plaintiff's position will be insufficient;
there must be evidence on which the jury could reasonably find for
the plaintiff.

*Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (quoting *Celotex Corp. v.
Catrett*, 477 U.S. 317, 322, 325 (1986)) (other quotations and citations omitted) (second
alteration in original).

In order to avoid summary judgment on a claim under the Americans with Disabilities
Act ("ADA"), a plaintiff bears "the burden of raising a genuine issue of material fact on each
element of [his] prima facie case."  *Doyal v. Oklahoma Heart, Inc.*, 213 F.3d 492, 495 (10th Cir.
2000); *see also Taylor v. Pepsi-Cola Co.*, 196 F.3d 1106, 1109 (10th Cir. 1999).

## ANALYSIS

Quinney's sole claim against Swire in this case is that Swire violated the ADA by failing
to reasonably accommodate his disability.  The ADA prohibits a covered entity from
discriminating "against a qualified individual on the basis of disability in regard to job
application procedures, the hiring, advancement, or discharge of employees, employee
compensation, job training, and other terms, conditions, and privileges of employment."  42

11

U.S.C. § 12112(a).  Under the ADA, a qualified individual is an individual with a disability who,

"with or without reasonable accommodation, can perform the essential functions of the

employment position that such individual holds or desires."  42 U.S.C. § 12111(8).

> In order to establish a prima facie case under the ADA, a
> plaintiff must prove:  (1) that he is a disabled person within the
> meaning of the ADA; (2) that he is qualified, that is, with or
> without reasonable accommodation (which he must describe), he is
> able to perform the essential functions of the job; and (3) that the
> employer terminated him because of his disability.

*Rascon v. U.S. West Commc'ns*, 143 F.3d 1324, 1332 (10th Cir. 1998) (quotations and citations

omitted).

　　　　For purposes of its motion for summary judgment, Swire does not dispute that Quinney is

disabled within the meaning of the ADA, thereby conceding that the first element of a prima

facie case is satisfied.  Swire does argue, however, that Quinney has failed to carry his burden

with respect to the second and third elements of a prima facie case.  The court will address those

arguments in turn.

## I.  Qualified Individual

　　　　To determine whether an individual is qualified under the ADA, the court first examines

"whether the individual can perform the essential functions of the job, i.e., functions that bear

more than a marginal relationship to the job at issue."  *Anderson v. Coors Brewing Co.*, 181 F.3d

1171, 1175 (10th Cir. 1999).   If the court "conclude[s] that the individual is not able to perform

the essential functions of the job at issue, [the court] must determine whether any reasonable

accommodation by the employer would enable [the individual] to perform those functions."  *Id.*

12

If the individual is unable, even with reasonable accommodations, to perform the essential functions if the job at issue, the court must then consider the issue of reasonable accommodation by reassignment.  Specifically, the court must consider whether the individual can perform the essential functions of a different job that the individual desires, either with or without reasonable accommodations.  *See Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1161 (10th Cir. 1999) (en banc) ("Although a qualified individual with a disability has to be someone who can perform the essential functions of a job, that inquiry is not limited to the employee's existing job.  Rather, the plain language of the statute includes an employee who has the ability to do other jobs within the company that such disabled employee 'desires.'" (quoting 42 U.S.C. § 12111(8)) (other quotations omitted)).

### A.  Essential Functions

Swire argues that Quinney could not perform the essential functions of the Account Manager position at Swire.  The court agrees.

"The term 'essential function' is defined as 'the fundamental job duties of the employment position the individual with a disability holds or desires.'" *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 915 (10th Cir. 2004) (quoting 29 C.F.R. § 1630.2(n)(1)).  "Determining whether a particular function is essential is a factual inquiry.  In conducting this inquiry, the finder of fact must give consideration to the employer's judgment regarding the functions of a job that are essential, including those functions contained in a written job description." *Id.* (quotations and citations omitted); *see also* 42 U.S.C. § 12111(8).

In its statement of facts, Swire asserts that the operation of a vehicle is an essential function of the Account Manager position.  Swire also notes that Quinney testified during his own deposition that he was required to operate a vehicle in order to perform duties of the Account Manager position.  In response to those assertions, Quinney states:  "Undisputed.  Mr. Quinney does not dispute that the Account Manager job involved driving."[20]

In addition, Quinney does not dispute several other important facts.  Quinney does not dispute that Swire's policies state that drivers of company vehicles are required "to drive a motor vehicle safely" and to "[n]ever drive while under the influence of alcohol, illegal drugs or legal drugs which may impair the ability to drive."[21]  Quinney does not dispute that on the same date Swire received the results of Quinney's drug test, it also received a report in which Dr. Anderson concluded that Quinney should not be operating company vehicles while taking his medications.  Quinney does not dispute that one of his own treating physicians, Dr. Lundberg, indicated that Quinney should not be driving while taking his medications.  Quinney does not dispute that another physician, Dr. Lordon, indicated that he would recommend that it was safe for Quinney to drive while taking his medications only if he successfully passed a driving test.  While Quinney asserts that his offer to take that test was refused by Swire, it is undisputed that he never took the test.

Notwithstanding those undisputed facts, Quinney argues that the parties dispute whether the essential functions of the Account Manager position include (1) the ability to operate a

---

[20]  Docket no. 24.

[21]  Docket no. 20, Exhibit A, Exhibit 9 thereto.

vehicle personally and (2) the ability to operate a vehicle safely.  For the following reasons, the court concludes that both of those arguments are without merit.

First, by arguing that the essential functions of the Account Manager position did not require the ability to drive a vehicle personally, Quinney implies that Swire was required to allow Quinney to keep his position as an Account Manager and have someone else, presumably another Swire employee, perform the driving required by that position.  Such an argument also implies that Swire failed to make a reasonable accommodation to allow Quinney to perform the essential functions of the Account Manager position, an issue that will be addressed in the following section of the court's analysis.  As that discussion will demonstrate, the assignment of another employee to help perform the duties of a job is not a reasonable accommodation.

Second, Quinney argues that while it is undisputed that he had the physical ability to operate a vehicle, it is disputed whether he had the ability to do so safely.  He urges the court to reject Swire's "novel argument that an essential function of the [A]ccount [M]anager job was not only the ability to drive, but the ability to drive <u>safely</u>."[22]  As noted above, however, Quinney has not disputed that Swire's policies require drivers of company vehicles "to drive a motor vehicle *safely*" and to "[n]ever drive while under the influence of alcohol, illegal drugs or legal drugs which may impair the ability to drive."[23]  Accordingly, by Quinney's own admission, it is undisputed that one of the essential functions of the Account Manager position is the ability to drive a vehicle safely.

---

[22]  Docket no. 24.

[23]  Docket no. 20, Exhibit A, Exhibit 9 thereto (emphasis added).

15

In a related argument, Quinney contends that he had been driving safely because he had been driving for many years without incident.  Quinney also asserts that he could have demonstrated his ability to drive safely by taking the above-referenced test, but Swire rejected that offer.  Those arguments fail.  The fact that Quinney had been driving for many years without incident is not determinative of whether he had indeed been driving safely.  Further, that fact is irrelevant because Swire was allowed to rely on the opinions of its medical professionals in concluding that Quinney could not drive safely.  *See, e.g.*, *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 974 (7th Cir. 2000) (stating that an employer is entitled to rely on medical determinations made by its medical professionals).  Quinney's offer to take the above-referenced driving test amounts to a requested accommodation, which is an issue the court will address in the following section of its analysis.  As that discussion will demonstrate, Swire was not required to accept Quinney's offer to take the driving test in order to comply with the ADA.

For these reasons, the court agrees with Swire and concludes that Quinney was unable to perform the essential functions of the Account Manager position.  Accordingly, the court turns to the issue of whether reasonable accommodations would have allowed Quinney to perform those functions.

### B.  Reasonable Accommodations – Account Manager Position

Swire first argues that Quinney failed to fulfill his responsibility to request reasonable accommodations that would permit him to perform one of the essential functions of the Account Manager position, namely, to operate a vehicle safely.  Swire correctly notes that an employer's duty to reasonably accommodate an individual's disability does not arise until that individual

16

initiates an "interactive process" with the employer "by proposing an accommodation and

showing that the accommodation was objectively reasonable." *Wells v. Shalala*, 228 F.3d 1137,

1145 (10th Cir. 2000).

With respect to this issue, Quinney again fails to dispute several important facts.  It is

undisputed that during discovery in this case, one of Swire's interrogatories asked Quinney to

"[i]dentify each and every request for reasonable accommodation you communicated to Swire, to

whom at Swire such request was made, the date such request was made and describe how you

conveyed such request."[24]  Quinney responded to that interrogatory as follows:  "I have never

requested any accommodations[.]"[25]  Another one of Swire's interrogatories asked Quinney to

"[d]escribe what specific accommodations you requested from Swire that would enable you to

perform the functions of the position you held or desired."[26]  Quinney responded by stating:  "It

was not necessary for me to request accommodations.  None were requested[.]"[27]

Based upon those undisputed facts, Quinney has admitted that he failed to fulfill his

obligation to propose any reasonable accommodations that would permit him to operate a vehicle

safely.  *See id*.  Moreover, and notwithstanding the foregoing undisputed facts, to the extent that

Quinney's arguments could be construed to be a requests for accommodations, the court

concludes that neither of those requests presented accommodations that were reasonable.

---

[24]  Docket no. 20, Exhibit P.

[25]  *Id*.

[26]  *Id*.

[27]  *Id*.

First, as the court discussed earlier, Quinney argues that the essential functions of the Account Manager position did not require the ability to drive a vehicle personally.  In making that argument, Quinney implies that Swire was required to allow him to keep his position as an Account Manager and have someone else, presumably another Swire employee, perform the driving required by that position.  Even if this argument could be construed as a request for an accommodation, it is not a reasonable accommodation.  *See, e.g.*, *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124-25 (10th Cir. 1995) ("An employer is not required by the ADA to reallocate job duties in order to change the essential function of a job.  An accommodation that would result in other employees having to worker harder or longer hours is not required." (citations omitted)); *Burnett v. Pizza Hut of Am., Inc.*, 92 F. Supp. 2d 1142, 1157 (D. Kan. 2000) ("[T]he court does not consider the hiring and assignment of another employee to help plaintiff perform the duties of her job to be a reasonable accommodation under the ADA.").

Second, and again as referenced earlier, Quinney argues that he offered to take a driving test to demonstrate that he could operate a motor vehicle safely, but Swire refused that offer.  In making that argument, Quinney appears to assume that Swire was somehow required to accept his offer in order to comply with the ADA.  However, Swire's refusal to extend the sole accommodation requested by Quinney does not compel the conclusion that it failed to comply with the ADA.  The undisputed facts, including those reflecting the medical opinions of Swire's medical professionals and Quinney's own physicians, support Swire's conclusion that Quinney was not able to operate a vehicle safely, regardless of whether he took the driving test.  As noted earlier, it was entirely proper for Swire to rely on the opinions of its medical professionals in

18

reaching that conclusion.  *See, e.g.*, *Bay*, 212 F.3d at 974 (stating that an employer is entitled to rely on medical determinations made by its medical professionals).  Accordingly, in the court's view, Quinney's offer to take the test did not amount to a reasonable accommodation.  *See, e.g.*, *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004) ("To defeat an employer's motion for summary judgment, the employee must first demonstrate that an accommodation appears reasonable on its face.").  As such, Swire was not required to accept it in order to comply with its obligation to reasonably accommodate Quinney's disability.

Based on the undisputed facts, the court concludes that Quinney failed to fulfill his obligation to request a reasonable accommodation that would permit him to perform one of the essential functions of the Account Manager position, namely, the ability to operate a vehicle safely.  In addition, to the extent that Quinney's arguments in response to the motion before the court could be construed to be requests for accommodations, the court has determined that those requests did not present accommodations that were reasonable.  For those reasons, the court concludes that Quinney has failed to demonstrate that any reasonable accommodations would have allowed him to perform the essential functions of the Account Manager position.  Having reached that conclusion, the court turns to the issue of reasonable accommodation by reassignment.

### C.  Reasonable Accommodation by Reassignment

Swire argues that Quinney's reasonable accommodation by reassignment claim fails because he has not identified a specific, vacant position within the company that he desired and for which he was qualified.  *See Pepsi-Cola Co.*, 196 F.3d at 1110.  Swire also argues that

19

Quinney's reasonable accommodation by reassignment claim fails because he has not demonstrated that he has suffered any injury. *Midland Brake, Inc.*, 180 F.3d at 1179.  In response, Quinney argues that while he fulfilled his obligation to initiate the required interactive process with respect to reasonable accommodation by reassignment, Swire failed to participate in that process. *See id.* at 1171-74.  The court will address those arguments in turn.

### 1.  Identification of Specific Position

In order to survive summary judgment on his claim for failure to accommodate by offering reassignment to a vacant position, Quinney must establish, among other things, that "he was qualified to perform an appropriate vacant job which he must specifically identify and show was available within the company at or about the time he requested reassignment." *Pepsi-Cola Co.*, 196 F.3d at 1110.  Quinney has failed to do so.

Quinney attempts to avoid this obligation by now arguing that he was willing to "do anything."[28]  That assertion, however, is belied by Quinney's failure to accept any of the alternative positions that Swire offered to him.  Notably, Quinney admits that Swire met with him on four separate occassions beginning in early July 2002 to assist him in his job search within Swire.  Quinney also admits that on each of those occasions, Swire presented him with a list of all open positions within the company and offered him every position for which he was qualified that did not involve the operation of a vehicle.  Finally, Quinney admits that he did not accept any of those positions.  While Quinney may have his own reasons for refusing those

---

[28]  Docket no. 24, Exhibit 4b.

offers, that does not eliminate his obligation to identify a specific, vacant position that he desired and for which he was qualified.

Quinney's assertion that he was willing to "do anything"[29] is further belied by his own deposition testimony, in which he admitted that he could not identify a specific, vacant position within Swire that he desired and for which he was qualified.  Instead, Quinney testified that Swire could have simply created a position for him, which is something Swire was not required to do in order to provide reasonable accommodation by reassignment.  *See, e.g., Midland Brake, Inc.*, 180 F.3d at 1174 ("It is not reasonable to require an employer to create a new job for the purpose of reassigning an employee to that job.").

For these reasons, the court concludes that Quinney has failed to establish that he identified a specific, vacant position that he desired and for which he was qualified.

### 2.  Injury

To survive summary judgment in his claim for failure to accommodate by reassignment, Quinney must also establish that he "suffered injury because the employer did not offer to reassign [him] to any appropriate vacant position."  *Id*. at 1179.  Quinney has failed to do so.

As noted above, Quinney admits that Swire offered him several positions during July and August of 2002 and that he did not accept any of those positions.  Despite that admission, and in an attempt to demonstrate injury, Quinney attempts to narrow the time frame.  Quinney argues

---

[29]  *Id*.

that because Swire did not offer to accommodate him by reassignment prior to July 2002, he became inactive, which caused his condition to worsen.  That argument fails for several reasons.

First, Quinney has failed to cite to any authority requiring Swire to offer him accommodation by reassignment prior to July 2002.  Second, Quinney has failed to cite to any authority requiring the court to focus exclusively on his chosen time frame.  In the court's view, Quinney's effort to narrow the time frame is nothing more than a self-serving attempt to focus on those facts favorable to his case and ignore those undisputed facts that are detrimental to his case.  Ironically, while Quinney urges the court to focus only on those events occurring prior to July 2002, he also accuses Swire of "skip[ping] over the time frame of December 2001 to June 2002."[30]

Finally, Quinney's claim that his injury was caused by Swire's failure to accommodate him prior to July 2002 is undermined by his own deposition testimony.  Quinney testified that the only way to prevent his condition from worsening was to do "physical therapy, stretching, rowing, weights–everything you can do to constantly move your back."[31]  Quinney also testified that his job as an Account Manager at Swire was the "perfect job" for his condition because it allowed him to stay active.[32]  When asked whether he could have remained active without a job, Quinney admitted that he could have done so.[33]  When asked why he did not do so, Quinney

---

[30]  Docket no. 24.

[31]  Docket no. 24, Exhibit 4b.

[32]  *Id.*

[33]  *See id.*

stated: "Because I was in–because–probably I was depressed.  I didn't do it for a few weeks.

And then it just got hard.  I just didn't do it.  It was too painful.  And it was probably I just didn't

want to get up and do it."[34]

       For the foregoing reasons, the court concludes that Quinney has failed to establish the

element of injury for his claim for failure to accommodate by reassignment.

### 3.  Interactive Process

       As previously noted, an employer's duty to reasonably accommodate an individual's

disability does not arise until that individual initiates an "interactive process" with the employer.

*Midland Brake, Inc.*, 180 F.3d at 1171.

> Once the employer's responsibilities within the interactive process
> are triggered by appropriate notice by the employee, both parties
> have an obligation to proceed in a reasonably interactive manner to
> determine whether the employee would be qualified, with or
> without reasonable accommodations, for another job within the
> company and, if so, to identify an appropriate reassignment
> opportunity if any is reasonably available.

*Id*.

       Quinney argues that while he fulfilled his obligation to initiate the interactive process,

Swire failed to participate in that process.  Again, however, Quinney focuses exclusively on the

time frame prior to July 2002.  In essence, he argues that Swire was somehow required to engage

in the interactive process during his chosen time frame.  The court has already rejected that tactic

as it was used in Quinney's argument with respect to injury, and the court rejects it again here.

---

[34] *Id*.

23

Again, Quinney has failed to cite to any authority requiring Swire to engage in the interactive process prior to July 2002. Further, Quinney has again failed to cite to any authority requiring the court to focus exclusively on his chosen time frame. As the court noted above, it is not persuaded by Quinney's self-serving effort to narrow the time frame.

It is undisputed that Swire offered to work with Quinney in identifying and possibly transferring him to a vacant position within Swire for which he was qualified. It is likewise undisputed that Swire offered Quinney several positions during July and August of 2002 and that he did not accept any of those positions. Based on those undisputed facts, it is clear that Swire did in fact fulfill its responsibility to engage in the interactive process. Consequently, the court concludes that Quinney's argument with respect to the interactive process is without merit.

For these reasons, the court concludes that Quinney's reasonable accommodation by reassignment claim fails. Consequently, and based on all of the foregoing, the court concludes that Quinney has failed to establish that he is a qualified individual under the ADA.

## II.  Termination

To establish the third and final element for a prima facie case under the ADA, Quinney is required to demonstrate "that the employer terminated him because of his disability." *Rascon*, 143 F.3d at 1332. Swire argues that it is not possible for Quinney to establish this element because he terminated his employment with Swire in order to receive long-term disability benefits. In response, Quinney does not dispute that he terminated his employment with Swire. Instead, he again reiterates that his claim is based on the narrow time frame referenced above and Swire's alleged failure to reasonably accommodate him prior to July 2002.

24

The court has already rejected Quinney's self-serving attempts to narrow the time frame. Accordingly, the court concludes that Quinney has failed to establish that Swire terminated him because of his disability.

<u>**CONCLUSION**</u>

Quinney has failed to establish that he is a qualified individual under the ADA or that Swire terminated him because of his disability.  Consequently, he has failed to carry his "burden of raising a genuine issue of material fact on each element of [his] prima facie case." *Doyal*, 213 F.3d at 495; *see also Pepsi-Cola Co.*, 196 F.3d at 1109.

Therefore, **IT IS HEREBY ORDERED:**

1.      Swire's motion for summary judgment[35] is **GRANTED**.

2.      Quinney's complaint in this case, and all claims contained therein, are

        **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**.

DATED this 18th day of May, 2009.

                        BY THE COURT:

                        _____
                        PAUL M. WARNER
                        United States Magistrate Judge

---

[35] *See* docket no. 19.